LIQUILUX GAS CORPORATION ET AL., demandantes y recurrentes, *v.* LUIS HUMBERTO BERRÍOS y OTROS, demandados y recurridos, y EDUARDO ZARAGOZA, tercero demandado y recurrido.

*Número:* CE-94-434 *Resuelto:* 30 de junio de 1995

---

852

*Carlos Rivera Vicente, Javier Cuevas Silva*, de *Cancio, Nadal, Rivera & Díaz*, y *José Trías Monge*, de *Trías & Meléndez*, abogados de la parte peticionaria; *Mario A. Rodríguez Torres* y *Guillermo Figueroa Prieto*, abogados de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Este recurso nos brinda la oportunidad de evaluar por primera vez el alcance del Canon 21 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, en lo pertinente a la representación simultánea de una corporación íntima y sus accionistas por un mismo bufete de abogados.

La demandante recurrente, Liquilux Gas Corporation, nos solicita que revoquemos una resolución del Tribunal Superior, Sala de San Juan (Hon. Dora T. Peñagarícano, Juez), que declaró con lugar una moción de descalificación presentada por la parte demandada recurrida contra el bufete Cancio, Nadal, Rivera & Díaz. El 20 de junio de 1994 ordenamos a la parte recurrida a mostrar causa por la cual no debíamos revocar dicha resolución. Evaluado el recurso presentado, estamos en posición de resolver. Confirmamos.

I

Para finales de 1991 los demandantes recurrentes, Liquilux Gas Corporation (Liquilux) y Puerto Rico Fuels (en

adelante PR Fuels), mostraron interés en adquirir Tropigás de Puerto Rico, Inc. (en adelante Tropigás). Con el fin de agilizar dicha compraventa, Liquilux autorizó a dos (2) de sus oficiales y accionistas minoritarios, los demandados recurridos Luis Humberto Berríos y Peter Newell (Berríos y Newell), a que adquirieran, para beneficio de la corporación, la totalidad de las acciones comunes de Tropigás que estuviesen en circulación.(1)

Berríos y Newell gestionaron esta compraventa sin la intervención de ningún otro oficial de Liquilux. De primera intención, éstos comparecieron a las negociaciones pertinentes como oficiales de dicha corporación. No obstante, a medida que las negociaciones progresaban, se percataron de que, si comparecían a nombre de Liquilux, la compraventa podía fracasar dado el hecho de que Eduardo Zaragoza, el accionista mayoritario, tenía una deuda contributiva considerable. Por lo tanto, y alegadamente para evitar que esto sucediera, optaron por realizar dicha gestión a nombre propio.

Al Zaragoza enterarse de que Berríos y Newell estaban tramitando la compraventa a nombre propio, se suscitó una controversia entre Zaragoza, por un lado, y Berríos y Newell, por otro, que impidió que estos últimos pudieran realizar un pago de doscientos setenta y cinco mil dólares ($275,000), requerido por Tropigás, para la fecha que se había estipulado. Ello causó que Tropigás diera por resuelto el contrato de compraventa.

A causa de esto, Liquilux y PR Fuels contrataron los servicios del Lcdo. Javier Cuevas Silva —del bufete Cancio, Nadal, Rivera & Díaz— para demandar a Berríos y Newell, sus esposas y a las correspondientes sociedades gananciales. En la demanda alegaron, en esencia, que los

---

(1) Liquilux Gas Corporation (en adelante Liquilux) es una corporación íntima o de familia compuesta por tres (3) accionistas: Eduardo Zaragoza, Peter Newell y Luis Humberto Berríos, quienes poseen, respectivamente, 67, 25 y 8% de las acciones de dicha corporación. Por otro lado, Zaragoza posee el 75% de las acciones de Puerto Rico Fuels (en adelante PR Fuels), también una corporación íntima, y Newell el 25%.

demandados violaron su deber de fiducia al usurpar una oportunidad corporativa para su beneficio personal. Poco después, Zaragoza, representado también por dicho bufete, presentó una demanda prácticamente idéntica a la de Liquilux contra Berríos y Newell, en su carácter personal.

Por su parte, Berríos y Newell reconvinieron contra Liquilux y alegaron, entre otras cosas, que habían sido despedidos injustificadamente. Además, reclamaron daños ascendentes a doscientos cincuenta mil dólares ($250,000). Luego de una serie de trámites procesales, Liquilux enmendó su demanda para añadir a Shell de Puerto Rico, Ltd. como demandada. Finalmente, Berríos y Newell interpusieron una demanda contra tercero a Zaragoza, en la cual alegaron que éste era el único culpable de que la compraventa de Tropigás se frustrara. Además, solicitaron un resarcimiento en daños tanto para Liquilux (mediante acción derivativa) como para ellos en su carácter de accionistas minoritarios (mediante acción directa).

A la luz de esta demanda contra tercero, Cancio, Nadal, Rivera & Díaz renunció a la representación legal de Zaragoza. No obstante ello, Berríos y Newell solicitaron la descalificación de tal bufete como representante de Liquilux. Adujeron que existía un conflicto de intereses insalvable entre la representación simultánea de Liquilux y Zaragoza, y que ello requería que dicho bufete renunciara a ambas representaciones. El bufete se opuso a dicha descalificación mediante una moción de desestimación en la cual alegó que la demanda contra tercero no era sino un subterfugio para descalificarlo. Poco después, Zaragoza desistió de su acción personal contra los demandados.

Mediante resolución, el Tribunal Superior, Sala de San Juan, declaró con lugar la moción de descalificación presentada por Berríos y Newell, y sin lugar la moción de desestimación de la demanda contra tercero. Si bien determinó que tanto la acción derivativa como la acción directa de Berríos y Newell eran improcedentes, concluyó que Za-

ragoza podría serle responsable a ellos o a Liquilux directamente, por lo cual declaró con lugar la demanda contra tercero.

Inconforme, el bufete Cancio, Nadal, Rivera & Díaz presentó un recurso de *certiorari* ante este Tribunal, en el cual solicitó que revocáramos la resolución del tribunal de instancia sobre la base de que no había conflicto de interés alguno entre su actual representación de Liquilux y su pasada representación de Zaragoza. Simultáneamente, dicho bufete solicitó la paralización de los procedimientos en instancia hasta tanto se resolviera el recurso.

El 20 de junio de 1994 accedimos a la solicitud de los recurrentes y paralizamos los procedimientos en instancia.([2]) Asimismo, concedimos a los demandados recurridos un término para comparecer y mostrar causa por la cual no debía revocarse la resolución del Tribunal Superior. Luego de analizar el escrito en cumplimiento de orden presentado por los recurridos, estamos convencidos de que el error no fue cometido. Confirmamos.

## II

El Canon 21 de nuestro Código de Ética Profesional, *supra*, le impone al abogado un deber de lealtad completa que se divide en dos (2) aspectos: (1) ejercer un criterio profesional independiente y desligado de sus propios intereses, y (2) no divulgar los secretos y las confidencias que el cliente haya compartido durante el transcurso de

([2]) El 16 de diciembre de 1994 la parte recurrente nos solicitó que dejáramos sin efecto la paralización de los procedimientos en instancia y ordenáramos la continuación de éstos bajo la representación legal temporera del Lcdo. Ricardo Rodríguez Padilla. El 20 de diciembre autorizamos al Tribunal Superior a continuar con dichos procedimientos, según lo solicitado por la parte recurrente.

Dicha orden en nada afecta la justiciabilidad del recurso de *certiorari*, puesto que, si revocáramos la descalificación del bufete Cancio, Nadal, Rivera & Díaz, dicho bufete continuaría representando a Liquilux en el caso de instancia.

sus representaciones pasadas y presentes.(³) *Robles Sanabria, Ex parte,* 133 D.P.R. 739 (1993).

■ El primer aspecto del deber de lealtad completa, que consiste en el requisito de ejercer un criterio profesional independiente y desligado de los intereses personales, proscribe cuando un abogado represente a un cliente cuyos intereses estén reñidos con los suyos propios. Véanse: *In re Belén Trujillo,* 126 D.P.R. 743 (1990); M. Ramos de Szendrey, *Conducta Profesional,* 64 Rev. Jur. U.P.R. 693 (1995). Ello ocurre, por ejemplo, cuando un abogado deja de realizar determinada acción que podría beneficiar a su cliente, porque ésta frustraría sus expectativas personales para el caso en cuestión. En estos casos el abogado tiene la obligación de renunciar a la representación de dicho cliente.

■ El segundo aspecto del deber de lealtad completa que tiene todo abogado para con su cliente, que consiste en

---

(³) Dicho canon del Código de Ética Profesional dispone, en su totalidad, lo siguiente:

"El abogado tiene para su cliente un deber de lealtad completa. Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las partes y con terceras personas, y cualquier interés en la controversia que pudiera influir en el cliente al seleccionar su consejero. Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales.

"No es propio de un profesional el representar intereses encontrados. Dentro del significado de esta regla, un abogado representa intereses encontrados cuando, en beneficio de un cliente, es su deber abogar por aquello a que debe oponerse en cumplimiento de sus obligaciones para con otro cliente.

"La obligación de representar al cliente con fidelidad incluye la de no divulgar sus secretos o confidencias y la de adoptar medidas adecuadas para evitar su divulgación. Un abogado no debe aceptar la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de otro cliente anterior ni servir como árbitro, especialmente cuando el cliente anterior le ha hecho confidencias que pueden afectar a uno u otro cliente, aun cuando ambos clientes así lo aprueben. Será altamente impropio de un abogado el utilizar las confidencias o secretos de un cliente en perjuicio de éste.

"Un abogado que representa a una corporación o sociedad le debe completa lealtad a la persona jurídica y no a sus socios, directores, empleados o accionistas y solamente puede representar los intereses de dichas personas cuando los mismos no vengan en conflicto con los de la corporación o sociedad.

"Cuando un abogado representa a un cliente por encomienda de otra persona o grupo, quien le paga al abogado por dicho servicio, debe renunciar la representación de ambos tan pronto surja una situación de conflicto de intereses entre la persona o grupo que le paga sus honorarios y la persona a quien representa." 4 L.P.R.A. Ap. IX.

el deber de no revelar confidencias que su cliente haya compartido, prohíbe que un abogado incurra en una representación simultánea o sucesiva adversa. *In re Belén Trujillo*, supra. Véanse, además: *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, 133 D.P.R. 112 (1993); *Robles Sanabria, Ex parte*, supra. Ello no quiere decir que un abogado no pueda representar simultánea o sucesivamente a dos (2) clientes en asuntos similares. Sólo proscribe que un abogado represente a un cliente en una controversia que esté sustancialmente relacionada a la de otro cliente actual o anterior cuando los intereses de ambos sean adversos. *Robles Sanabria, Ex parte*, supra. Véase, además, *Developments in the Law: Conflicts of Interest in the Legal Profession*, 94 Harv. L. Rev. 1244, 1295–1296 (1981).

En lo que respecta a las representaciones simultáneas adversas, cuando éstas surgen en la actualidad, no cabe duda que el único remedio disponible para el abogado es renunciar a ambas representaciones y no sólo a una. Véanse, *e.g.*: *Ortiz v. Soliván Miranda*, 120 D.P.R. 559, 562 (1988); *In re Roldán González*, 113 D.P.R. 238, 243 (1982). Esta acción podría parecer extrema en aquellos casos cuando la posibilidad de que surja tal relación es aún remota. No obstante ello, la doctrina prevaleciente tanto en nuestra jurisdicción como en Estados Unidos ha favorecido que, aun cuando el conflicto resulte potencial, el abogado renuncie a ambas representaciones. Como expresa un comentarista al respecto:

> [t]he attorney may pursue the clients' interests during the course of the litigation in a way that avoids actual conflict but does not serve the best interests of each client. In addition, potentially differing interests may come into actual conflict, necessitating subsequent withdrawal. By this point, withdrawal can have serious consequences which could have been avoided had the attorney withdrawn at the outset.
> An attorney who simultaneously represents potential conflicting interests in the litigation context may thus serve his client less than adequately. (Escolios omitidos.) *Developments in the Law*, supra, págs. 1307–1308.

Dicha postura nos parece adecuada, pues, como hemos expresado antes, quien no sea capaz de representar libre, fiel y adecuadamente a su cliente vulnera la lealtad absoluta que le debe a éste y, por lo tanto, "no está en condiciones de ejercer la profesión". *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778, 788 (1984).

### III

Examinados los principios generales que regulan los conflictos de intereses derivados de la representación simultánea adversa de dos (2) clientes en nuestro ordenamiento jurídico, veamos cómo el Canon 21 del Código de Ética Profesional, *supra,* se enfrenta específicamente a los conflictos de intereses que surgen de la representación simultánea de una corporación y sus accionistas. Debido a la falta de precedentes en nuestra jurisdicción, en lo que respecta el campo corporativo, examinaremos también, a modo de ejemplo, cómo otras jurisdicciones se han enfrentado a disposiciones homólogas.

Tanto nuestro citado Canon 21 como la Regla 1.13 del Modelo de Conducta Profesional de la *American Bar Association*,(⁴) parten de la premisa de que, "en ausencia de representación dual[,] el abogado de una organización tiene una relación de abogado y cliente con la 'entidad' y no con sus miembros". *In re Carreras Rovira y Suárez Zayas*, supra, págs. 794–795. Ello encuentra apoyo en nuestro derecho corporativo, que le otorga a la corporación una personalidad jurídica separada e independiente de la de sus accionistas. Como representante de dicha entidad, el abogado que represente a una corporación le debe, por lo tanto, una "completa lealtad a la persona jurídica y no a

---

(⁴) Véase A.B.A. Center for Professional Responsibility, *Model Rules of Professional Conduct* Sec. 1.13 (1994).

sus socios, directores, empleados o accionistas y solamente puede representar los intereses de dichas personas cuando los mismos no vengan en conflicto con los de la corporación". 4 L.P.R.A. Ap. IX.

■ Debido a que es a la corporación a quien el abogado corporativo le debe completa lealtad, aunque nuestro Canon 21 del Código de Ética Profesional, *supra*, permite la representación simultánea o sucesiva de la corporación y sus accionistas, ésta debe ejercerse únicamente en casos excepcionales. Como expresa Fletcher en su tratado de derecho corporativo:

> The idea of dual representation is now very much suspect. ... As corporate counsel, the attorney is under an obligation to seek the best course for the corporate entity —including the minority plaintiffs' interests— without being subject to conflicting influences and loyalties relating to the defendant. ... [Thus,] in order to insure the corporation the freedom of alignment that will serve its best interest, it seems that independent counsel should be retained whenever there is a potential for abuse and suggestion of conflict. 13 *Fletcher's Cyclopedia of the Law of Private Corporations* Sec. 6025, págs. 442–443 (1991).

Varias jurisdicciones estatales han adoptado esta posición a la hora de determinar si el abogado de una corporación puede, además, asumir la representación de uno de sus accionistas. Por ejemplo, en *Messing v. FDI, Inc.*, 439 F. Supp. 776 (D. N.J. 1977), el Tribunal Supremo de Nueva Jersey dispuso que para evitar que la decisión inicial sobre el rol que debe asumir la corporación esté viciada de un interés adverso a ésta, debe evitarse la representación dual. Íd., págs. 781–782. Por otro lado, en *Schmidt v. Magnetic Head Corp.*, 476 N.Y.S.2d 151 (1984), el Tribunal Supremo de Nueva York dispuso que cuando una corporación pudiera tener una causa de acción contra uno de sus directores, pero no la ejerce porque los directores representados de forma simultánea por el abogado corporativo no reco-

miendan este curso de acción, dicho abogado debe ser descalificado. Íd., pág. 158.(⁵)

Se ha señalado que, por su particular naturaleza, las corporaciones íntimas o familiares no deben ser sometidas a tan riguroso tratamiento en lo que respecta a la representación dual. Las corporaciones íntimas están reguladas por la Sec. 1102(c) de nuestra Ley General de Corporaciones, 14 L.P.R.A. sec. 1102(c), y reciben un trato particular en nuestro ordenamiento jurídico. Sin embargo, tienen que estar compuestas por once (11) accionistas o menos; así tienen mayor libertad que las corporaciones tradicionales para escoger el modo como se ejercerá su dirección y administración. Inclusive pueden ser dirigidas y administradas por un solo accionista. 14 L.P.R.A. sec. 1102(c).

█ Debido a ello, en este tipo de corporación se da una relación interna distinta a la que se desarrolla en las corporaciones tradicionales, que son mucho más estructuradas. Los directores y accionistas se consideran más bien socios y asumen la posición de directores o accionistas únicamente en sus negociaciones con terceros. L.E. Mitchell, *Professional Responsibility and the Close Corporation: Toward a Realistic Ethic*, 74 Cornell L. Rev. 466, 469 (1989).

█ Por otro lado, los derechos de los accionistas que controlan la corporación y los de la propia corporación suelen ser, en la mayor parte de los casos, idénticos e inseparables. Es por ello que, contrario al caso de las corporaciones tradicionales, en el cual la representación dual es excepcional, el abogado que representa a una corporación íntima suele representar a los accionistas que controlan la corporación en su carácter individual. *In re Browns-*

---

(⁵) Para una visión similar a la de Fletcher, véanse, además: I *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* Sec. 1.13:602, pág. 433 (2da ed. 1992), y *Developments in the Law: Conflicts of Interest in the Legal Profession*, 94 Harv. L. Rev. 1244, 1349–1350 (1981).

*tein*, 602 P.2d 655, 656 (Or. 1979). Ello se fomenta para evitar que dichas corporaciones tengan que duplicar innecesariamente los gastos de representación. Véase Mitchell, *supra.*

No obstante lo anterior, los tratadistas de derecho corporativo han sido claros al expresar que, al igual que en el caso de las corporaciones tradicionales, un abogado puede representar tanto a la corporación como a su accionista mayoritario, únicamente cuando los intereses de ambos no estén en conflicto. 1 *O'Neal's Close Corporations* Sec. 2.02 (3ra ed. 1992). Esta posición ha sido adoptada por varios foros estatales.

Por ejemplo, en *In re Banks*, 584 P.2d 284, 292 (Or. 1978), el Tribunal Supremo de Oregón dispuso que la única posición ética que un abogado de una corporación íntima podía asumir, cuando los intereses que había estado representando se tornaban opuestos, era no representar ni al individuo ni a la corporación. Íd., pág. 292. Por otro lado, en *In re Brandsness*, 702 P.2d 1098 (Or. 1985), dicho tribunal expresó que un abogado que represente a una corporación íntima así como a su presidente no podrá luego representar a dicho presidente en contra de otro accionista de la corporación. Íd., págs. 1102–1103.

 Consideramos acertada la posición asumida por el tribunal en *In re Banks*, supra, relativa a que tan pronto surjan posiciones encontradas entre una corporación íntima y su accionista mayoritario, el abogado que los esté representando a ambos simultáneamente tiene la obligación de renunciar a ambas representaciones. Dicha posición es compatible con la regla que hemos adoptado en esta jurisdicción, con respecto a que en aquellos casos de representación simultánea en que haya una posibilidad de conflicto, es preciso declinar là representación de ambas partes. *Ortiz v. Soliván Miranda*, supra; *In re Roldán González*, supra.

## IV

Antes de pasar a evaluar si el bufete de Cancio, Nadal, Rivera & Díaz debe ser descalificado —por estar ante una situación de un potencial conflicto de intereses— resulta necesario examinar cuándo procede descalificar a un abogado o a un bufete de abogados.

■ Este Tribunal ha dispuesto que las mociones de descalificación no constituyen de por sí acciones disciplinarias, sino más bien medidas preventivas para evitar posibles violaciones a los cánones de ética profesional. *K-Mart Corp. v. Walgreens of P.R., Inc.*, 121 D.P.R. 633, 637 (1988). Es por ello que los tribunales de instancia pueden evaluar y resolver dichas mociones cuando se presenten en casos que se ventilan ante sí. Íd., pág. 638.

Por otro lado, hemos expresado que como las mociones de descalificación constituyen medidas preventivas, no es necesario que se aporte una prueba sobre una violación ética para que procedan. En estos casos, "la apariencia de impropiedad será utilizada para resolver cualesquiera dudas que surjan sobre posible conflicto de intereses, en favor de la descalificación". *In re Carreras Rovira y Suárez Zayas*, supra, pág. 792.

■ Ello no significa que la mera presentación de una moción de descalificación dé lugar, sin más, a que ésta se ordene. Al evaluar este tipo de moción, los tribunales tienen el deber de sopesar los intereses en conflicto. En ese proceso deben tomarse en consideración elementos tales como si quien solicite la descalificación tiene legitimación activa para invocarla;[6] la gravedad del conflicto de interés involucrado; la complejidad del derecho o los hechos pertinentes a la controversia, y el *expertise* de los abogados in-

---

[6] Para satisfacer el requisito de legitimación activa es necesario que el promovente demuestre que la representación en controversia le causa un perjuicio o una desventaja indebida en el caso. Véase M. Ramos de Szendrey, *Conducta Profesional*, 64 Rev. Jur. U.P.R. 693 (1995).

volucrados; la etapa de los procedimientos cuando surja la controversia sobre la descalificación y su posible efecto en cuanto a la resolución justa, rápida y económica del caso, y el propósito detrás de la descalificación; es decir, si la moción de descalificación está siendo utilizada como un mecanismo procesal para dilatar los procedimientos. Véanse: Ramos de Szendrey, *supra*, y *Fed. Pesc. Playa Picúas v. U.S. Inds., Inc.*, 135 D.P.R. 303, 327 (1994), opinión concurrente en parte y disidente en parte emitida por la Juez Asociada Señora Naveira de Rodón.

Cuando la moción de descalificación incluya no sólo a un abogado, sino también al bufete al cual éste pertenezca, resultará necesario considerar otros factores adicionales para determinar si la situación amerita que se descalifique al bufete en su totalidad. Es decir, hay que determinar si la descalificación del abogado en particular (descalificación primaria) debe imputársele al bufete en general (descalificación imputada).

La doctrina de descalificación imputada "autoriza la imputación de la causal de descalificación primaria a todos los abogados del bufete o agrupación. ... [E]sta imputación asume el carácter particular de una presunción de confidencias compartidas. Según el caso, esta presunción puede convertir al bufete o grupo de abogados en un solo abogado, de manera que quedaría descalificado de aquella representación ... sucesiva adversa". *Robles Sanabria, Ex parte*, supra, pág. 752.

Dicha presunción no se activa de forma automática en todo caso. Ésta aplica únicamente a aquellos bufetes o grupos de abogados cuyo ambiente se caracterice por "el libre flujo y fácil acceso a información o por incentivos considerables para que los abogados compartan información entre sí". *Robles Sanabria, Ex parte*, supra, pág. 752. Aun en los casos en los cuales se determine que ésta aplica, esto no siempre conllevará la descalificación automática

del bufete. Si se trata de un caso en que la parte opositora podría demostrar razonablemente que no existe una razón de peso que justifique su descalificación, la presunción sería refutable. *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra. En cambio, si se trata de un caso en que no resulte razonable concluirlo, la presunción sería irrefutable. En estos casos, la mera presunción convierte al bufete de abogados en un solo abogado para fines de la doctrina de descalificación imputada. *Robles Sanabria, Ex parte*, supra.

Examinada la doctrina prevaleciente sobre la descalificación primaria e imputada, examinemos si se justifica su aplicación en el caso de marras.

## V

La parte recurrida nos señala en su comparecencia que, no obstante el hecho de que el bufete Cancio, Nadal, Rivera & Díaz puso fin a su representación simultánea adversa de Liquilux y Zaragoza al renunciar, a través de su representante, el Lcdo. Javier Cuevas Silva, a la representación de Zaragoza, dicho bufete debe ser descalificado por existir un conflicto de intereses insalvable entre su representación actual de Liquilux y su pasada representación de Zaragoza. En otras palabras, los recurridos aducen que, como resultado de la representación simultánea de Liquilux y Zaragoza, se desarrolló una relación entre el bufete y éste último que requería que Cancio, Nadal, Rivera & Díaz renunciara no sólo a su representación de Zaragoza, sino también a su representación de Liquilux. Plantean, en esencia, una posible violación a los deberes de lealtad y de confidencialidad que tiene todo abogado hacia sus clientes.

Como abogado de una corporación íntima, el Lcdo. Javier Cuevas Silva le debía completa lealtad a dicha entidad corporativa y no a sus accionistas. Canon 21 del Código de Ética Profesional, *supra*. Conforme con este canon, Cuevas

Silva sólo podía representar simultáneamente al accionista mayoritario y a la corporación si los intereses representados no estaban en conflicto.

Si bien de primera intención el pleito de marras no aparentaba contener conflicto de interés alguno, una vez la parte recurrida trajo a Zaragoza como tercero demandado, surgió la posibilidad de que la causa próxima del daño sufrido por Liquilux estuviese ligada a él y no a los accionistas minoritarios. Ante este hecho, la probabilidad de que la relación entre Zaragoza y el licenciado Cuevas Silva prejuiciara la estrategia asumida por este último, al punto de forzarlo a asumir posiciones desfavorables para Liquilux con tal de no perjudicar a Zaragoza, se tornó muy real.

Aun cuando el licenciado Cuevas Silva optara por representar fielmente a la corporación, como lo exige el Canon 21 del Código de Ética Profesional, *supra*, cabría la posibilidad de que se viera forzado a utilizar la información obtenida en confidencia de Zaragoza, como resultado de su representación anterior de éste, para su perjuicio. Cualquiera de las dos (2) posiciones sería contraria al deber de lealtad que todo abogado le debe a sus clientes, que consiste en ejercer un criterio profesional independiente y no divulgar sus secretos y confidencias.

Ante una representación simultánea que resultaba adversa dado el hecho de que, independientemente de la posición que asumiera en el caso de marras, Cuevas Silva iba a incumplir con su deber de lealtad hacia uno de sus clientes, éste tenía la obligación de renunciar a su representación de ambos, tal y como dispusimos antes. Si aplicamos el principio de que cualquier duda sobre la existencia de un conflicto de interés debe ser resuelto en favor de la descalificación, tenemos que concluir que actuó con corrección el foro de instancia al decretar la descalificación del licenciado Cuevas Silva. Un examen de los factores que deben

considerarse al evaluar la procedencia de una moción de descalificación así lo comprueba. Veamos.

En primer lugar, los recurridos, sin lugar a dudas, poseen legitimación activa para solicitar la descalificación, puesto que se verían directamente afectados si no se descalificara al abogado en cuestión. Además, la gravedad del conflicto de interés presentado es incuestionable dado el hecho de que no importa la posición asumida por Cuevas Silva, éste incumpliría con su deber de lealtad para con uno (1) de sus dos (2) clientes.

Por otro lado, la controversia expuesta no requiere un *expertise* particular, que impida que otro abogado o grupo de abogados pueda representar adecuadamente a Liquilux. Además, si bien la demanda del caso fue presentada hace ya algún tiempo, lo cierto es que la ventilación del caso en sus méritos se ha visto retrasada por la gran cantidad de trámites procesales que han realizado ambas partes hasta esta fecha. Por lo tanto, al hacer un balance de intereses, no hay duda que evitar un conflicto de intereses pesa mucho más que fomentar la solución rápida de estos procedimientos.

 Finalmente, estamos convencidos de que, contrario a lo que alega la parte recurrente, la demanda contra tercero no constituye un mero subterfugio para atrasar los procedimientos judiciales en instancia al forzar la descalificación del licenciado Cuevas Silva. Como bien dispone la parte recurrida, la mera consolidación de dos (2) pleitos no ocasiona que las partes de uno de los pleitos se conviertan en partes del otro pleito. Véase la Contestación a orden para mostrar causa de la parte recurrida, pág. 5. Ante este hecho, los recurridos no tenían otra alternativa que traer a Zaragoza como tercero demandado.(7)

_____

(7) En cuanto a los méritos de dicha demanda, debemos recordar que, según la Regla 12.1 de Procedimiento Civil, en cualquier momento después de haber comenzado el pleito, el demandado puede traer a cualquier persona que no sea parte en el pleito y que sea o pueda serle responsable al demandado en todo o en parte de la

# VI

■ Sólo nos resta evaluar si, a la luz de la doctrina de la descalificación imputada, era necesario descalificar además al bufete Cancio, Nadal, Rivera & Díaz.

En primer lugar, debemos mencionar que por su tamaño relativamente pequeño, y por el hecho de que más de un abogado firmó las mociones y los alegatos presentados por dicho bufete, no resulta insostenible concluir que estamos ante un bufete caracterizado por el libre flujo de ideas y fácil acceso a información, o por incentivos considerables para que los abogados compartan información.

Aun cuando entendiéramos que no sea razonable concluir que en el caso de autos, Cancio, Nadal, Rivera & Díaz podía demostrar que no existía una razón de peso que justificara su descalificación, el bufete no colocó al tribunal de instancia en posición de establecer qué medidas preventivas tomó para evitar cualquier filtro de información pertinente al caso de marras. Véase la Resolución del Tribunal Superior, pág. 15. Ante esta realidad, y para proteger a Liquilux y/o a Zaragoza contra conductas desleales, o contra el uso adverso de confidencias y de secretos por aquellos abogados del bufete que no participaron directamente en su representación, pero sí estaban al tanto de ésta, entendemos que procedía imputarle la descalificación del licenciado Cuevas Silva y del bufete Cancio, Nadal, Rivera & Díaz.

# VII

No estamos ajenos al hecho de que al Liquilux ser una corporación íntima dominada, en esencia, por Zaragoza, si

---

reclamación del demandante. 32 L.P.R.A. Ap. III. Dicha demanda constituye una adjudicación de responsabilidad por parte de los demandados y no necesariamente tiene que invocar una nueva causa de acción. Es por ello que el tribunal de instancia actuó correctamente al declarar sin lugar la moción de desestimación de la demanda contra tercero, no obstante haber declarado sin lugar la acción derivativa y la acción directa presentadas por la parte recurrida.

se deja en manos de éste último la contratación y supervisión de una nueva representación legal, las estrategias asumidas por dicha representación serían las más beneficiosas para Zaragoza y no necesariamente favorecerían a la corporación.

Si bien en las corporaciones íntimas se da una relación particular entre los socios y la entidad corporativa, no podemos descartar por ello la existencia de una entidad jurídica separada e independiente. Ni el Canon 21 del Código de Ética Profesional, *supra*, ni la Ley General de Corporaciones, *supra*, le confieren un tratamiento distinto a dichas corporaciones en lo que respecta a la personalidad jurídica de éstas.

Ante esta realidad, consideramos prudente que la contratación de una nueva representación legal independiente recaiga en manos de la Junta de Directores de Liquilux, y no únicamente de Zaragoza. Una vez contratada, dicha representación deberá responderle directamente a la Junta, nunca a un solo director. De este modo garantizamos que los intereses de la corporación queden debidamente protegidos en todo momento.

Por todo lo anterior, *confirmamos la resolución del Tribunal Superior.*

El Juez Asociado Señor Rebollo López no intervino. El Juez Asociado Fuster Berlingeri disintió sin opinión escrita.